Carlton R. Asher, Jr. (CA-8530)
LAW OFFICES OF CARLTON R. ASHER, JR.
110 East 59th Street, Suite 2900
New York, New York 10022-1304
Tel.: (212) 308-7171
*Attorneys for Defendants and*
 *Counterclaim Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- x

SYNOVICS PHARMACEUTICALS, INC.,

                            Plaintiff,

           - against -

NIRMAL MULYE and NOSTRUM
PHARMACEUTICALS, INC.,

                         Defendants.

------------------------------------------- x

NOSTRUM PHARMACEUTICALS, INC.
 (n/k/a Nostrum Investments, Inc.),

                        Counterclaim Plaintiff,

           - against -

SYNOIVCS PHARMACEUTICALS, INC.,

                        Counterclaim Defendant.

------------------------------------------- x

08 Civ. 5861 (JSR) (DFE)

**AMENDED ANSWER**

       Defendant Nirmal Mulye ("Mulye") and defendant and counterclaim plaintiff

Nostrum Pharmaceuticals, Inc. (n/k/a Nostrum Investments, Inc.) ("Nostrum" and

together "Defendants"), by their undersigned attorneys, as and for their Amended

Answer to the Complaint (the "Complaint") of plaintiff and counterclaim defendant

Synovics Pharmaceuticals, Inc. ("Synovics") herein, allege, upon knowledge with

respect to their own acts and upon information and belief as to all other matters, as follows:

1. Deny the allegations contained in paragraph 1 of the Complaint, except admit that Synovics purports to bring the action as alleged therein.

2. Deny the allegations contained in paragraph 2 of the Complaint, except refer the Court to the settlement agreement, the escrow agreement and the pleadings in the actions and proceedings referred to therein for a full and complete statement of their content.

3. Deny the allegations contained in paragraph 3 of the Complaint, except admit that all prior actions and proceedings between the parties herein were dismissed pursuant to a settlement agreement executed on or about July 31, 2007 and refer the Court to that agreement for a full and complete statement of its content.

4. Deny the allegations contained in paragraph 4 of the Complaint, except admit that Nostrum's shares of Synovics' common stock were placed in escrow pursuant to the terms of the parties' settlement and escrow agreements and refer the Court to such agreements for a full and complete statement of their content.

5. Deny the allegations contained in paragraph 5 of the Complaint, except admit that Bank of India released and discharged Defendants from their individual and corporate guarantees and refer the Court to the agreements and other documents referred to therein for a full and complete statement of their content.

6. Deny the allegations contained in paragraph 6 of the Complaint.

7. Deny the allegations contained in paragraph 7 of the Complaint.

2

8. Deny the allegations contained in paragraph 8 of the Complaint, except admit that Synovics purports to bring the action as alleged therein.

9. Admit the allegations contained in paragraph 9 of the Complaint.

10. Admit the allegations contained in paragraph 10 of the Complaint, except deny the allegation that Mulye was the beneficial owner at all relevant times of all of the outstanding capital stock of Nostrum.

11. Admit the allegations contained in paragraph 11 of the Complaint.

12. Admit the allegations contained in paragraph 12 of the Complaint.

13. Deny the allegations contained in paragraph 13 of the Complaint, except admit that Synovics purports to bring this action before this Court as alleged therein and refer the Court to the settlement and escrow agreements referred to therein for a full and complete statement of their content.

14. Deny the allegations contained in paragraph 14 of the Complaint, except admit that Nostrum is in the business, among other things, of developing pharmaceutical products using its controlled release and other technology therefor and that Synovics is in the business, among other things, of seeking to manufacture and sell certain pharmaceutical products.

15. Deny the allegations contained in paragraph 15 of the Complaint, except admit that in 2005 Synovics and Nostrum entered into agreements providing Synovics with rights in certain pharmaceutical products in exchange for which Nostrum received certain shares of Synovics common stock and refer the Court to the agreements referred to therein for a full and complete statement of their content.

16.    Deny the allegations contained in paragraph 16 of the Complaint, except admit that Mulye, the director of Nostrum and beneficial owner of its outstanding capital stock, served for a period of time as a member of Synovics' board of directors and as its chief scientific officer.

17.    Admit the allegations contained in paragraph 17 of the Complaint, except refer the Court to the pleadings, motions, orders and other papers filed in the proceedings referred to therein for a full and complete statement of their content.

18.    Admit the allegations contained in paragraph 18 of the Complaint, except deny the allegations to the extent that they assert that a single license agreement was involved in the prior cases before this Court and refer the Court to the pleadings filed in such cases for a full and complete statement of their content.

19.    Admit the allegations contained in paragraph 19 of the Complaint, except refer the Court to the pleadings filed in the arbitration proceeding referred to therein for a full and complete statement of their content.

20.    Deny the allegations contained in paragraph 20 of the Complaint, except admit that Synovics filed an action in the United States District Court for the District of New Jersey and refer the Court to the pleadings, motions and other papers filed in that action for a full and complete statement of their content.

21.    Deny the allegations contained in paragraph 21 of the Complaint, except refer the Court to the pleadings, motions, orders and other papers filed in the proceedings referred to therein for a full and complete statement of their content.

22.   Admit the allegations contained in paragraph 22 of the Complaint, except refer the Court to the settlement agreement referred to therein for a full and complete statement of its content.

23.   Deny the allegations contained in paragraph 23 of the Complaint and refer the Court to the settlement referred to therein for a full and complete statement of the terms thereof.

24.   Deny the allegations contained in paragraph 24 of the Complaint, except admit that the shares of Synovics' common stock referred to therein were placed in escrow and that Synovics would be entitled to obtain the shares if certain conditions were met in accordance with the terms of the parties' settlement and escrow agreements and refer the Court to such agreements for a full and complete statement of their content.

25.   Admit the allegations contained in paragraph 25 of the Complaint, except refer the Court to the escrow agreement referred to therein for a full and complete statement of its content.

26.   Deny the allegations contained in paragraph 26 of the Complaint, except refer the Court to the settlement agreement referred to therein for a full and complete statement of its content.

27.   With respect to paragraph 27 of the Complaint, admit the allegations contained in the first sentence, deny the allegations contained in the second sentence and refer the Court to the provisions of the settlement and escrow agreements referred to therein for a full and complete statement of their content.

28.  Admit the allegations contained in paragraph 28 of the Complaint and refer the Court to the guarantees and undertaking referred to therein for a full and complete statement of their content.

29.  With respect to paragraph 29 of the Complaint, admit the allegations contained in the first two sentences, deny the allegations contained in the third sentence and refer the Court to the settlement and escrow agreements referred to therein for a full and complete statement of its content.

30.  With respect to paragraph 30 of the Complaint, admit the allegations contained in the first sentence, deny the allegations contained in the second sentence and refer the Court to the settlement agreement referred to therein for a full and complete statement of its content.

31.  Admit the allegations contained in paragraph 31 of the Complaint and refer the Court to the notices and other documents referred to therein for a full and complete statement of their content.

32.   With respect to paragraph 32 of the Complaint, admit the allegations contained in the first and third sentences, deny the allegations contained in the second sentence and refer the Court to the letter, certificate and other documents referred to therein for a full and complete statement of their content.

33.  Deny the allegations contained in paragraph 33 of the Complaint.

34.  Deny the allegations contained in paragraph 34 of the Complaint.

35.   Admit the allegations contained in paragraph 35 of the Complaint, except refer the Court to the letters and other documents referred to therein for a full and complete statement of their content.

36.    Deny the allegations contained in paragraph 36 of the Complaint, except admit the allegation that Nostrum asserted that there was a default on the credit agreement referred to therein and refer the Court to the purported letter dated March 26, 2008 referred to therein for a full and complete statement of its content.

37.    Admit the allegations contained in paragraph 37 of the Complaint.

38.    Deny the allegations contained in paragraph 38 of the Complaint.

39.    Deny the allegations contained in paragraph 39 of the Complaint.

40.    Deny the allegations contained in paragraph 40 of the Complaint.

41.    Deny the allegations contained in paragraph 41 of the Complaint.

42.    With respect to paragraph 42 of the Complaint, repeat and reallege each and every allegation set forth in paragraphs 1 through 41 of their Amended Answer herein with the same force and effect as if fully set forth herein.

43.    Admit the allegations contained in paragraph 43 of the Complaint.

44.    Deny the allegations contained in paragraph 44 of the Complaint, except admit that Synovics seeks the relief alleged therein.

45.    With respect to paragraph 45 of the Complaint, repeat and reallege each and every allegation set forth in paragraphs 1 through 44 of their Amended Answer herein with the same force and effect as if fully set forth herein.

46.    Deny the allegations contained in paragraph 46 of the Complaint.

47.    Deny the allegations contained in paragraph 47 of the Complaint.

48.    Deny the allegations contained in paragraph 48 of the Complaint.

49.  With respect to paragraph 49 of the Complaint, repeat and reallege each and every allegation set forth in paragraphs 1 through 48 of their Amended Answer herein with the same force and effect as if fully set forth herein.

50.  Deny the allegations contained in paragraph 50 of the Complaint.

51.  Deny the allegations contained in paragraph 51 of the Complaint.

52.  Deny the allegations contained in paragraph 52 of the Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

53.  The Complaint fails to state a claim upon which relief may be granted.

### Second Affirmative Defense

54.  The claims asserted by Synovics are barred by the doctrines of waiver and estoppel.

### Third Affirmative Defense

55.  The claims asserted by Synovics are barred, in whole or in part, by reason of its own contributory or comparative negligence or other culpable conduct.

### Fourth Affirmative Defense

56.  The claims asserted by Synovics are barred, in whole or in part, by reason of its failure to mitigate damages.

### Fifth Affirmative Defense

57.  This Court lacks personal jurisdiction over the Defendants with respect to the second and third "counts" alleged in the Complaint.

### Sixth Affirmative Defense

58.  At all relevant times, Defendants acted in good faith and exercised at least that degree of care, diligence and skill which a reasonably prudent person would exercise under similar circumstances and in like positions.

### Seventh Affirmative Defense

59.  The claims asserted by Synovics are barred, in whole or in part, by reason of its failure of performance pursuant to the settlement agreement and the escrow agreement referred to in the Complaint.

### Eighth Affirmative Defense

60.  Synovics does not have standing, in whole or in part, to assert the claims alleged in the second and third "counts" of the Complaint.

### AMENDED COUNTERCLAIM

Defendant and counterclaim plaintiff Nostrum Pharmaceuticals, Inc. (n/k/a Nostrum Investments, Inc.) ("Nostrum") asserts the within amended counterclaim against plaintiff and counterclaim defendant Synovics Pharmaceuticals, Inc. ("Synovics"), and in support thereof alleges, upon knowledge with respect to its own acts and upon information and belief as to all other matters, as follows:

### The Parties

61.  Nostrum is a Delaware corporation with its principal place of business at 505 Thornall Street, Suite 304, Edison, New Jersey 08837. At all relevant times, Nostrum has been engaged, among other things, in the business of developing time release and other technology for pharmaceutical products.

62.   Synovics is a Nevada corporation with its principal place of business located at 5360 NW 35th Avenue, Ft. Lauderdale, Florida 33309.  At all relevant times, Synovics, a public corporation, has been engaged in the business, among other things, of seeking to develop, manufacture and sell pharmaceutical products.

63.   Nostrum incorporates the allegations set forth in paragraphs 1 through 60 of its Amended Answer herein with the same force and effect as if fully set forth herein.

### Jurisdiction

64.   This Court has supplemental jurisdiction over this counterclaim pursuant to 28 U.S.C. § 1367 and the common law principles of ancillary jurisdiction.   The counterclaim arises out of the transactions and occurrences alleged in "Count One" of Synovics' Complaint herein and is so related to such claim that it forms a part of the same case or controversy.   This Court also has jurisdiction over the counterclaim pursuant to 28 U.S.C. § 1332 based upon diversity of citizenship.   The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

### The Parties' Prior Agreements, the Bank of India Credit Agreement and Synovics' Default Thereunder

65.   Commencing in June 2004, Nostrum and Synovics entered into two pharmaceutical product development and licensing agreements involving up to a total of 20 orally administered control-released drug products.

66.   Pursuant to the first license agreement dated as of June 16, 2004 and a related stock purchase agreement, Synovics (then known as Bionutrics, Inc.) issued six million shares of its common stock to Nostrum in payment for a license

10

for the right to develop, manufacture and sell four proprietary to be named pharmaceutical candidates that qualify for filing with the U.S. Food and Drug Administration ("FDA") under a "505(b)(2)" application using Nostrum's technology.

67.    Thereafter, Nostrum and Synovics entered into a second license agreement dated as of March 16, 2005, which superseded the original agreement and provided Synovics with the right to develop, manufacture and sell up to ten generic drug products and up to ten "505(b)(2)" products using Nostrum's technology.    As part of the consideration for this license, Synovics issued to Nostrum a further six million shares of its common stock and undertook to pay Nostrum a 50% royalty based on the gross profits from the future sale of any such generic products.

68.    On or about May 17, 2006, Nostrum and Synovics Laboratories, Inc. ("Synovics Labs"), a subsidiary of Synovics, entered into an agreement pursuant to which Nostrum granted Synovics Labs an exclusive license to develop, make, market and sell Metformin 500mg and Metformin 750mg extended release tablets using Nostrum's technology and transferred to Synovics Labs Nostrum's Abbreviated New Drug Application ("ANDA") for the Metformin 500mg product.    In consideration for this agreement, Synovics Labs agreed to pay Nostrum, among other things, a $150,000 milestone payment upon FDA approval of the ANDA, and a royalty on sales of the ANDA product equal to 20% of the net sales up to a maximum of $1,500,000.

69.    On or about May 23, 2006, Synovics acquired privately-held Kirk Pharmaceuticals, LLC and ANDAPharm, LLC (and affiliated companies) (the "Kirk Acquisition"), based in Ft. Lauderdale, Florida.    In connection with the transaction,

Synovics entered into a Credit Agreement with Bank of India dated as of May 22, 2006 (the "Credit Agreement") in the amount of $10.5 million ("Bank of India Financing"), the proceeds of which were used, along with an equity investment of $6,000,000 from Maneesh Pharmaceuticals Pvt. Ltd., for (a) the Kirk Acquisition and (b) working capital purposes.  Nostrum and its principal stockholder, Nirmal Mulye ("Mulye") provided unconditional financial guarantees (the "Guarantees") and a separate written undertaking (the "Undertaking") to Bank of India in connection with the Bank of India Financing.  In return, the interest cost of the Bank of India Financing (on which there were no points) was and continues to be prime plus one percent.

70.  Commencing in August 2006, shortly following the closing of the Bank of India Financing and the Kirk Acquisition, and continuing until July 2007, Synovics and Synovics Labs, in substantial breach of their material obligations under the aforesaid product license agreements, failed and refused (a) to conduct work preparatory to, and necessary for, the performance of any clinical studies with regard to many of the licensed products; (b) to use diligent efforts to manufacture, market, distribute and sell the Metformin 500mg product and (c) to pay or reimburse Nostrum, as required, for its reasonable costs and expenses in connection with the performance of its obligations under these agreements.  The sums due Nostrum thereunder included research, development and certain other costs in an amount in excess of $1,100,000, and despite having received FDA approval of the Metformin ANDA in July 2006, neither Synovics nor Synovics Labs paid Nostrum the milestone payment due Nostrum.

71. In addition to its repudiation of its obligations under the aforesaid license agreements, Synovics' Board of Directors adopted a "Poison Pill" Rights Agreement and related By-law amendments effective as of September 20, 2006 pursuant to which Synovics sought to prevent Nostrum from exercising its rights as the largest stockholder of Synovics. Although Nostrum nominated three qualified individuals for election to Synovics' Board of Directors at an annual meeting of its stockholders that was scheduled to be held in August 2007, Synovics management cancelled the meeting. To Nostrum's knowledge, Synovics has never held a meeting of its shareholders from the inception of Nostrum's investment in 2004 until the present date.

72. In addition, Synovics commenced an arbitration and two related proceedings before this Court in 2006 and 2007 in which it asserted claims purporting to justify its clear breach of its obligations under the aforesaid license agreements. Synovics also filed in the United States District Court for the District of New Jersey an entirely meritless case seeking, among other things, to impose a constructive trust over Nostrum's unrelated business assets.

73. Pursuant to a Settlement Agreement entered into by Synovics, Synovics Labs, Nostrum and Mulye as of July 31, 2007 (the "Settlement Agreement") and a related Escrow Agreement between Synovics and Nostrum dated as of July 31, 2007 (the "Escrow Agreement"), copies of which are annexed as Exhibits 1 and 2 to the Complaint, Synovics and Synovics Labs, on the one hand, and Nostrum and Mulye, on the other hand, agreed to settle all of the claims and disputes between them.

74.  Nostrum agreed to, and did deposit with the Escrow Agent (the "Escrow Agent") pursuant to the Settlement Agreement and the Escrow Agreement all of the 10,661,000 shares of Synovics' common stock (the "Escrowed Shares") which it then owned.

75.  Pursuant to paragraph 6 of the Settlement Agreement, Synovics was required, among other things, to use its "reasonable best efforts" to obtain from Bank of India a full release and discharge of the Guarantees and the Undertaking that Nostrum and Mulye had delivered to Bank of India in connection with Synovics' prior Bank of India Financing.  In the event that Synovics was not able to obtain Bank of India's release and discharge of the Guarantees and the Undertaking on or before April 30, 2008, the Escrowed Shares, pursuant to paragraph 7 of the Settlement Agreement, were to be returned to Nostrum or its designee, free and clear of all claims by Synovics, Bank of India or the Escrow Agent.

76.   Since Nostrum and Mulye remained at substantial risk under the Guarantees to Bank of India with regard to Synovics' credit facility, Nostrum and Mulye bargained for an additional provision, to which Synovics agreed pursuant to paragraph 7 of the Settlement Agreement, that Nostrum could also obtain return of the Escrowed Shares "[i]n the event that a default with [Bank of India] is not cured within sixty (60) days, upon instruction by Nostrum".  In such event, the Escrowed Shares were to be transferred to Nostrum or its designee, free and clear of all claims by Synovics or the Escrow Agent.

14

77.    Given the substantial credit risks associated with Synovics and the Credit Agreement's strict "Event of Default" provisions (set forth at length in Exhibit A hereto), it is significant that the Settlement Agreement contains no provision excusing transfer of the Escrowed Shares to Nostrum based on Synovics' purported "cure" outside of the 60-day period set forth in paragraph 7 of the Settlement Agreement.

78.    Pursuant to paragraph 8 of the Settlement Agreement, Nostrum also received anti-dilution protection for its shares of Synovics common stock, if and to the extent they were to be returned to Nostrum, thus ensuring that Nostrum would hold (and be able to vote) at least 32% of the outstanding shares of Synovics common stock on a fully diluted basis.

79.    Paragraph 8 of the Settlement Agreement specifically provides, in relevant part, that in the event that Synovics issues during the Escrow Period (as defined) (the "Escrow Period") any common stock or securities convertible, exchangeable or exercisable into shares of its common stock or other rights to acquire shares of its common stock which would cause the Escrowed Shares to represent less than 32% of the outstanding shares of Synovics' common stock on a fully diluted basis, then if the Escrowed Shares are released to Nostrum, Synovics is required to issue to Nostrum at the time of such release additional shares of its common stock ("Additional Shares") without consideration by Nostrum such that the Escrowed Shares together with the Additional Shares will represent on a fully diluted basis 32% of the outstanding shares of Synovics common stock.

80.    Nostrum and Mulye obtained the three provisions in the Settlement Agreement regarding the Escrowed Shares and the Additional Shares as consideration for their continuing unconditional Guarantees and to protect them, through Nostrum's continued ownership of Synovics' voting stock, from the consequences of Synovics' poor financial condition and the substantial credit risks for Nostrum and Mulye arising from their Guarantees in the likely and foreseeable event that Synovics defaulted on its obligations under the Credit Agreement with Bank of India.

81.    Article VIII of the Credit Agreement (the text of which is annexed hereto as Exhibit A) sets forth the "Events of Default" for Synovics' Bank of India Financing.    The "Events of Default" and the enforcement and seizure provisions contained therein are broad, unconditional and substantially unforgiving.    Since there are no "notice" or "cure" provisions following a monetary or other Event of Default,  Synovics and any guarantors such as Nostrum and Mulye are subject to immediate legal action by Bank of India in the event that an installment payment under the Credit Agreement is not timely made.

82.    Under the provisions of Article VIII and the other provisions of the Credit Agreement, Synovics' uncertain ability to cure its repeated financial defaults in prior years provided no consolation to Nostrum and Mulye; hence, they insisted on the special provisions in the Settlement Agreement referred to above.

83.    In connection with Nostrum's communications with Bank of India relating to its own existing banking and credit relationships, Nostrum was directly informed by Bank of India on March 18, 2008 that Synovics had not then paid Bank

16

of India an installment payment in the amount of $250,000 that was first due and payable to Bank of India on January 15, 2008 under the Credit Agreement and that Synovics had not cured the default within 60 days of its occurrence.

84. By letter dated March 21, 2008, along with an Affidavit of Anil Anand, a consultant to Nostrum, sworn to March 20, 2008, Nostrum instructed the Escrow Agent pursuant to the Settlement Agreement and the Escrow Agreement to transfer the Escrowed Shares to Nostrum. As therein stated, Bank of India had not, as of March 21, 2008, delivered to Nostrum or Mulye a release of their obligations under the Guarantees.

85. By reason of Synovics' default in making the payment due Bank of India under the Credit Agreement on January 15, 2008, and such default not having been cured within 60 days of its occurrence, the Escrow Agent is required, pursuant to such instruction, to transfer all of the Escrowed Shares to Nostrum pursuant to the terms of the Settlement Agreement and the Escrow Agreement.

86. In Synovics' response dated March 26, 2008 objecting to Nostrum's instruction letter dated March 21, 2008, Synovics significantly did not rebut Nostrum's affidavit or adequately address the contractually relevant issues pursuant to paragraph 7 of the Settlement Agreement. Synovics' response explicitly conceded that Synovics was in default under the Credit Agreement. (Indeed, "Events of Default" is defined in Section 8.01 of the Credit Agreement to include, among other things, Synovics' "fail[ure] to pay the principal, interest, fees or commissions relating to any Advance when due and payable". *See* Exhibit A hereto.) Moreover, Synovics did not deny Nostrum's sworn evidence that Synovics

17

was in default on a significant monetary obligation for more than 60 days, nor did Synovics offer any written documentation signed by Bank of India purporting to cure the default (written consent being required under the terms of the Credit Agreement), nor did Synovics assert that any such documentation exists. Although Synovics claimed in its March 26, 2008 response that Bank of India "informally and *now* formally" (emphasis added) agreed to modify the terms of the Credit Agreement, it did not disclose when, if ever, such modification actually occurred.

87.    Accordingly, when six weeks later Synovics purportedly gave the Escrow Agent a written instruction dated April 29, 2008 demanding release of the Escrowed Shares to Synovics, such instruction was contractually invalid and of no force and effect. By letter dated April 29, 2008, Nostrum promptly so informed the Escrow Agent and repeated its instructions, originally made on March 21, 2008, for transfer of the Escrowed Shares to Nostrum.

88.    During the Escrow Period, Synovics issued to third parties millions of additional securities in the form of common stock as well as other securities convertible, exchangeable or exercisable into shares of its common stock or other rights to acquire shares of its common stock. As a result thereof, the Escrowed Shares, which currently consist of 10,661,000 shares of Synovics' common stock, represent substantially less that 32% of Synovics' outstanding common stock on a fully diluted basis.

### Declaratory Relief Requested

89.  Nostrum repeats and realleges the allegations set forth above with the same force and effect as if fully set forth herein.

90.  Synovics' objection to the Escrow Agent's release of the Escrowed Shares to Nostrum and the Escrow Agent's decision not to do so without the consent of Synovics and Nostrum or until a court has indicated it is proper, constitutes a justiciable controversy regarding the rights and obligations of the parties under the Settlement Agreement and the Escrow Agreement requiring the Court's intervention.

91.  Accordingly, Nostrum requests that the Court declare the following:

(a)  Nostrum has fully performed all of its obligations under the Settlement Agreement and the Escrow Agreement;

(b)  as of March 18, 2008, Synovics was in default of its obligation to pay  Bank of India an installment payment pursuant to the Credit Agreement in the amount of $250,000 that was first due and payable to Bank of India on January 15, 2008 and that Synovics had not cured such default within 60 days of its occurrence;

(c)  pursuant to the Settlement Agreement, and Nostrum's due notice given to the Escrow Agent on March 21, 2008, the Escrowed Shares were required to be transferred to Nostrum at that time, free and clear of any claim by Synovics or the Escrow Agent;

(d)  Synovics is required to instruct the Escrow Agent to immediately transfer the Escrowed Shares to Nostrum;

(e) Synovics is required to issue to Nostrum such Additional Shares of its common stock such that the Escrowed Shares together with the Additional Shares will represent on a fully diluted basis 32% of the outstanding shares of Synovics common stock.

WHEREFORE, defendant Nirmal Mulye and defendant and counterclaim plaintiff Nostrum Pharmaceuticals, Inc. (n/k/a Nostrum Investments, Inc.) demand judgment dismissing the Complaint herein, with prejudice; Nostrum further demands judgment on its amended counterclaim against Synovics, declaring and directing that Synovics deliver, or instruct the Escrow Agent to deliver, forthwith, to Nostrum all of the Escrowed Shares, together with all dividends, distributions, products and proceeds thereof, and issue to Nostrum such Additional Shares of its common stock such that the Escrowed Shares together with the Additional Shares will represent on a fully diluted basis 32% of the outstanding shares of Synovics common stock; and Mulye and Nostrum demand judgment for their costs and disbursements, including reasonable fees for attorneys, accountants and experts, incurred in connection with this action and such other and further relief as to the Court may seem just and proper.

New York, New York
August 26, 2008

LAW OFFICES OF CARLTON R. ASHER, JR.

By _Carlton R. Asher_

    Carlton R. Asher, Jr. (CA-8530)
Attorneys for Defendant Nirmal Mulye and
  Defendant and Counterclaim Plaintiff
  Nostrum Pharmaceuticals, Inc.
110 East 59th Street, Suite 2900
New York, New York 10022-1304
(212) 308-7171

## EXHIBIT A

ARTICLE VIII TO CREDIT AGREEMENT BETWEEN
SYNOVICS PHARMACEUTICALS, INC. AND
BANK OF INDIA DATED AS OF MAY 22, 2006

EVENTS OF DEFAULT

SECTION 8.01. EVENTS OF DEFAULT. If any of the following events shall occur:

(a)    The Borrower shall fail to pay the principal, interest, fees or commissions relating to any Advance when due and payable; or

(b)    Any representation or warranty made or deemed made by the Borrower in this Agreement or by any Guarantor or any other statement furnished at any time under or in connection with any Credit Document shall prove to have been incorrect in any material respect as of the date made or deemed made; or

(c)    The Borrower or any Guarantor shall fail to perform or observe any term, covenant, or agreement contained in any Credit Documents (other than the Note) to which it is a party; or

(d)    The Borrower or any Guarantor shall (1) fail to pay any installment pursuant to the terms of the Note when due or any interest or premium thereon, when due by scheduled maturity, required prepayment, acceleration, demand or otherwise within thirty (30) days following the due date, or (2) fail to perform or observe any term, covenant or condition required to be performed or observed by it under any agreement or instrument relating to any such indebtedness if the effect of such failure to perform or observe is to accelerate, or to permit the acceleration after the giving of notice or passage of time or both, of the maturity of such indebtedness, whether or not such failure to perform or observe is waived by the holder of such indebtedness; or any such indebtedness shall be declared to be due and payable or required to be prepaid (other than by a regularly scheduled required  prepayment) prior to the stated maturity thereof; or

(e)    The Borrower or any Guarantor (1) shall generally not, or shall be unable to, or shall admit in writing  their inability to, pay their Debts as such debts become due; or (2) shall make an assignment for the benefit of creditors or petition or apply to any tribunal for the appointment of a custodian, receiver or trustee for them or a substantial  part of their assets; or (3) shall commence any proceeding under any bankruptcy, reorganization, arrangements, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; or (4) shall have any such petition or application filed or any such proceeding commenced against them in which an order for relief is entered or

adjudication or appointment is made and remains undismissed for a period of sixty (60) days or more; or (5) by any act or omission shall indicate their consent to, approval of or acquiescence in any such petition, application, proceeding or order for relief or in the appointment of a custodian, receiver, or trustee for all or any substantial part of their properties; or (6) shall suffer any such custodianship, receivership or trusteeship to continue undischarged for a period of sixty (60) days or more; or (7) shall die; or

(f)  One or more judgments, decrees or orders for the payment of money in excess of $150,000.00 shall be rendered against the Borrower or any Guarantor and such judgments, decrees or orders shall continue unsatisfied and in effect for a period of sixty (60) consecutive days without being vacated, discharged, satisfied, stayed or bonded pending appeal; or

(g)  The Security Agreement shall at any time and for any reason cease (1) to create a valid and perfected first priority security interest in and to the collateral and purported to be the subject thereto or (2) to be in full force and effect or shall be declared null and void, or the validity or enforceability thereof shall be contested by the Borrower or any Guarantor or the signatory; or

(h)  The Guaranty shall, at any time and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability thereof shall be contested by any Guarantor or any Guarantor shall deny any further liability or obligation under or shall fail to perform their respective obligation under the Guaranty;

THEN, and in every such event, the Bank may (1) declare the Note, all interest thereon, and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the Note, all such interest, and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors; and (2) with or without taking possession thereof, sell or cause to be sold, at such price or prices as the Bank shall so determine in a commercially reasonable manner, and for cash or on credit or for future delivery, without assumption of any credit risk, all or any portion of the Collateral, at any public or private sale, without demand of performance or notice of intention to sell or of time or place of sale. Each purchaser at any such sale (including, if applicable, the Bank) shall acquire and hold the Collateral sold absolutely free from any claim or right of whatever kind including any equity or redemption, and the Borrower and the Guarantor hereby waive (to the extent permitted by law) all rights of redemption, stay and/or appraisal which they now have or may have at any time in the future under any rule of law or statute now existing or hereafter enacted.  Any public or private sale of the Collateral or any part thereof shall be held at such time or times within ordinary business hours and at such place or places as the Bank may fix in the notice of such sale.  At such sale, the Collateral, or any portion thereof, to be sold may be sold in one lot as an

entirety or in separate parcels, as the Bank may (in its sole discretion) determine and, if permitted by law, the Bank may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness) for and purchase the Collateral or any portion thereof for the account of the Bank. The Bank shall not be obligated to make any sale of the whole or any part of the Collateral if it shall determine not to do so. The Bank may, by announcement at the time and place fixed for sale, without prior notice or publication, adjourn any public or private sale of collateral or cause the same to be adjourned from time to time, and such sale may, without further notice, be made at the time and place to which the same was adjourned. In the case of all or any part of the Collateral is made on credit or for future delivery, the collateral so sold may be retained by the Bank until the sale price is paid by the purchaser or purchasers  thereof, but the Bank shall incur no liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.